**PHILLIPS & PAOLICELLI, LLP**
Steven Phillips, Esq.
Victoria Phillips, Esq.
Russell J. Curley, Esq
747 Third Avenue, 6th Floor
New York, NY 10017
(609) 789-5600
(212) 388-5100
sphillips@p2law.com
vphillips@p2law.com
rcurley@p2law.com
*Attorneys for Plaintiffs*

**COONEY & CONWAY, PC**
Kevin Conway, Esq. (*Pro Hac Vice to be submitted*)
191 N. Wacker Drive, Suite 1500
Chicago, IL 60606
(312) 236-6166
kconway@cooneyconway.com
*Attorneys for Plaintiffs*

**WATERS, KRAUS, PAUL & SIEGEL, LLP**
Peter A. Kraus, Esq. (*Pro Hac Vice to be submitted*)
Caitlyn Silhan, Esq. (*Pro Hac Vice to be submitted*)
3141 Hood Street, Suite 700
Dallas, Texas 75219
(866) 297-4524
kraus@waterskraus.com
*Attorneys for Plaintiffs*

**SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, LLP**
Arnold Lakind, Esq.
Janine Bauer, Esq.
101 Grovers Mill Road, Ste. #200,
Lawrenceville, NJ 08648
alakind@szaferman.com
jbauer@szaferman.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TAMMY O'LEARY,<br><br>      Plaintiff<br><br>vs.<br><br>E.I. DU PONT DE NEMOURS & COMPANY; DUPONT SPECIALTY PRODUCTS, USA, LLC; DUPONT DE NEMOURS, INC.; CORTEVA, INC.; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; THE 3M COMPANY; SOLVAY SPECIALTY POLYMERS, USA, LLC; SOLVAY SOLEXIS, INC.; and JOHN DOE ENTITIES #1-10,<br><br>      Defendants. | CIVIL ACTION NO.<br>1:26-cv-9997<br><br><br><br><br><br>**COMPLAINT AND JURY DEMAND** |

1

Now comes Plaintiff TAMMY O'LEARY by way of Complaint against Defendants, E.I. DU PONT de NEMOURS & COMPANY; DUPONT DE NEMOURS, INC; DUPONT SPECIALTY PRODUCTS, USA, LLC; CORTEVA, INC.; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; THE 3M COMPANY, INC.; SOLVAY SPECIALTY POLYMERS, USA, LLC; SOLVAY SOLEXIS, INC.; and JOHN DOE ENTITIES #1-10 (collectively "Defendants"), allege as follows:

## I. NATURE OF ACTION

1.     This is a civil action brought by TAMMY O'LEARY ("Plaintiff"). It seeks to recover damages for personal injuries sustained and that will be sustained by TAMMY O'LEARY.

## II. PLAINTIFF'S INJURIES

2.   TAMMY O'LEARY suffers from personal injuries including but not limited to the following:

  a.  Ulcerative colitis

  b.  Pain and suffering

  c.  Emotional distress,

  d.  Disability, and

  e.  Loss of enjoyment of life's pleasures.

## III. THE SUBSTANCES PROXIMATELY CAUSING PLAINTIFF'S INJURIES

3. Plaintiff's injuries and derivative damages were foreseeably caused by Defendants' misconduct, which resulted in the release of per-and polyfluoroalkyl substances to which Plaintiff was exposed.

4.   Hereafter per- and polyfluoroalkyl substances ("PFAS"), including what are sometimes called "legacy" PFAS that Defendants claim to no longer use or sell (including but not limited to Perfluorooctanoic acid or PFOA, perfluorooctanesulfonic acid or PFOS, perfluorononanoic acid or PFNA, and Surflon, a mixture containing multiple PFAS including PFNA, PFOA, and longer carbon-chained PFAS (e.g., perfluoroundecanoic acid, perfluorotridecanoic acid)), and what are sometimes referred to as "alternative" or "replacement" PFAS (such as perfluoropolyether dicarboxylates ("PFPE-DCAs"), chloroperfluoropolyether carboxylates ("ClPFPECAs"), monofunctional surfactants (MFS), and bifunctional surfactants (BFS), and "GenX") are all collectively referred to as "PFAS".

5.   PFAS individually and in mixtures have the capacity to cause and/or to aggravate the injuries and disorders suffered by Plaintiff as well as:

   a.  adverse reproductive outcomes including but not limited to infertility, subfertility, premature births, spontaneous abortion, still birth, birth defects, developmental delays, genetic damage, and embryonic tumors,

   b.  malignancies, tumors and neoplasms including but not limited to breast cancer, kidney cancer, brain cancer, ovarian cancer, bladder cancer, sarcoma, testicular cancer, pancreatic cancer, colon cancer, liver cancer, and embryonal tumors,

   c.  non-malignant disorders including, diabetes, gestational diabetes, kidney disease, kidney failure, peripheral neuropathy, obesity, thyroid disease, endometriosis, elevated cholesterol, coronary artery disease, ulcerative colitis, impaired vision, and scoliosis.

6.   PFAS have the capacity to act in an additive and/or synergistic fashion such that exposures to PFAS and mixed exposures to the PFAS and other toxic substances enhance their capacity to inflict and/or exacerbate the harm(s) of the type described above.

3

7.      The mechanisms by which PFAS inflict harm include but are not limited to:

    a.  apoptosis (cell death)

    b.  oxidative stress

    c.  genotoxicity (spontaneous or de novo mutation),

    d.  epigenetic change,

    e.  diminished cellular nourishment,

    f.  impaired cell-to-cell communication,

    g.  endocrine disruption,

    h.  impaired or excessive immune response,

    i.  intrauterine growth retardation,

    j.  impaired organogenesis,

    k.  the capacity to cross placental and brain barriers,

    l.  bio-persistence.

8.   There is no safe level of exposure to PFAS.

9.   While exposure to the PFAS (e.g., quantum of exposure, duration(s) of exposure and timing of exposure relative to the adverse outcome) typically operate along a dose- response gradient such that increases in the amount and duration of exposure increase the potential for harm, even a single exposure in a small amount has the capacity to cause or aggravate the injuries sustained by Plaintiff, and cause other injuries.

10.  Plaintiff does not assert that she was exposed to aqueous film-forming foam (AFFF). Plaintiff disclaims any such exposure and disclaims recovery of any portion of their damages determined by a factfinder to have been caused by exposure to AFFF.

11.  Plaintiff does not assert that she was exposed to chemicals arising out of any contracts Defendants had with the federal government in the 1940s or 1950s. Plaintiff disclaims any such exposure and disclaims recovery of any portion of their damages determined by a factfinder to have been caused by such exposures.

### IV.  THE PARTIES

#### a.  The Plaintiff

12. TAMMY O'LEARY is an adult citizen of Gloucester County, New Jersey who was born on October 17, 1964.

13. Since approximately 2007, she has lived at 36 Jackson Street, Swedesboro, New Jersey.

14. Tammy lived at 34 Home Street, Gibbstown, New Jersey from approximately 2005-2007

15. Prior to this, Tammy lived in Paulsboro, NJ from approximately 1968-1992, Mullica Hill, NJ from approximately 1992-1997, Pitman, NJ from approximately 1997-2000, and 2002 -2005, and Williamstown, NJ for short periods in approximately 2005-2006 and in 2014 or 2015.

**The Defendants**

16.  Defendant E.I. du Pont de Nemours & Company ("DuPont") is a corporation duly organized under the laws of the State of Delaware with its principal place of business located at Chestnut Run Plaza, 974 Centre Road, Wilmington, Delaware 19805.

17.  DuPont was formerly known as DowDuPont, Inc.

18.  DuPont is, for purposes of determining diversity of citizenship, a citizen of the State of

Delaware.

19. On June 1, 2019, DowDuPont, Inc. separated its agriculture business through the spin-off of Defendant, Corteva, Inc.

20. Defendant, Corteva, Inc. ("Corteva") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 9330 Zionsville Road, Indianapolis, Indiana 46268, (as well as 1000 N West St. Suite 900, Wilmington, Delaware 19801).

21. Corteva is, for purposes of determining diversity of citizenship, a citizen of the State of Indiana.

22. On June 1, 2019, Dupont separated is specialty products business through the spin-off of Defendant DuPont de Nemours, Inc., which retained DuPont's legacy chemicals, materials science, and specialty products businesses. Dupont de Nemours, Inc. is incorporated in Delaware, and its principal place of business is located at 974 Centre Road, Wilmington, Delaware 19805.

23. Dupont Specialty Products USA, LLC is a limited liability company duly organized under the laws of Delaware with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

24. Dupont Specialty Products USA, LLC is a wholly owned subsidiary of DuPont de Nemours, Inc., with that corporate parent acting as the sole member of the LLC.

25. Defendants, Dupont, Dupont Specialty Products USA, LLC, DuPont de Nemours, Inc. and Corteva, will collectively be referred to as "E.I.D.P." in this Complaint.

26. Defendant, the Chemours Company ("Chemours Co."), is a corporation organized under the laws of the State of Delaware with its principal place of business and corporate

6

headquarters located at 1007 Market Street, Wilmington, Delaware 19801.

27.    Chemours Co. is, for purposes of determining diversity of citizenship, a citizen of the State of Delaware.

28.    Defendant, The Chemours Company FC, LLC ("Chemours FC"), is a limited liability company duly organized under the laws of the State of Delaware with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19805. As a limited liability company, Chemours FC's citizenship is determined by the citizenship of each of its members. *See, e.g., Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010).

29.    Chemours FC is, for purposes of determining diversity of citizenship, a citizen of the State of Delaware.

30.    Defendants, Chemours Co. and Chemours FC, will collectively be referred to as "Chemours" in this Complaint.

31.    E.I.D.P. and Chemours operated a chemical manufacturing facility located at 67 Canal Road and Route 130, in Pennsville and in Carneys Point Township New Jersey known as Chambers Works ("Chambers Works") from which the PFAS and other toxic chemicals described in this Complaint were released into the environment to which Plaintiff was exposed.

32.    Defendant the 3M Company ("3M") is a corporation duly organized under the laws of the State of Minnesota with its principal place of business at 3M Center, St. Paul, Minnesota 55144..

33.    Defendants 3M supplied PFAS for use at the Chambers Works facility in New Jersey to which Plaintiff was exposed, and 3M also supplied PFAS for use at the West Deptford,

Thorofare, or Leonard Lane Facility in New Jersey ("Leonard Lane") to which Plaintiff was exposed.

34. Defendant, Solvay Specialty Polymers, USA, LLC ("Solvay USA"), is a corporation duly organized under the laws of the State of Delaware with its principal place of business located in Houston, Texas.

35. Defendant Solvay Solexis, Inc. ("Solvay Solexis") is the predecessor of Solvay USA and was a corporation duly organized under the laws of the State of Delaware with its principal place of business located in Houston, Texas.

36. Defendants, Solvay USA and Solvay Solexis, will collectively be referred hereinafter as "Solvay" in this Complaint.

37. Defendants John Doe Entities #1-10 are fictitious names of corporations, companies, partnerships, or other business entities or organizations whose identities cannot be ascertained as of the filing of this Complaint, certain of which are successors to, predecessors or alter egos of, or are otherwise related to, the identified defendants in this matter or which are otherwise liable pursuant to the causes of action set forth herein.

## V.   JURISDICTION AND VENUE

38. 3M is subject to personal jurisdiction in this case because, at all times relevant to this litigation, 3M produced, manufactured, marketed, distributed, and/or sold PFAS or products containing PFAS to customers throughout New Jersey and Plaintiff's claims arise from and relate to 3M's substantial contacts in New Jersey.

39. E.I. DU PONT DE NEMOURS & COMPANY is subject to personal jurisdiction in this case because, at all times relevant to this litigation, E.I. DU PONT DE NEMOURS

8

& COMPANY produced, manufactured, marketed, distributed, utilized, and/or sold PFAS to customers throughout New Jersey, and emitted PFAS into the environment in New Jersey, and Plaintiff's claims arise from and relate to E.I. DU PONT DE NEMOURS & COMPANY 's substantial contacts in New Jersey.

40.    THE CHEMOURS COMPANY is subject to personal jurisdiction in this case because, at all times relevant to this litigation, THE CHEMOURS COMPANY produced, manufactured, marketed, distributed, utilized, and/or sold PFAS to customers throughout New Jersey, and emitted PFAS into the environment in New Jersey, and Plaintiff's claims arise from and relate to THE CHEMOURS COMPANY 's substantial contacts in New Jersey.

41.    THE CHEMOURS COMPANY FC, LLC is subject to personal jurisdiction in this case because, at all times relevant to this litigation, THE CHEMOURS COMPANY FC, LLC produced, manufactured, marketed, distributed, utilized, and/or sold PFAS to customers throughout New Jersey, and emitted PFAS into the environment in New Jersey, and Plaintiff's claims arise from and relate to THE CHEMOURS COMPANY FC, LLC's substantial contacts in New Jersey.

42.    CORTEVA, INC. is subject to personal jurisdiction in this case because, at all times relevant to this litigation, CORTEVA, INC. produced, manufactured, marketed, distributed, utilized, and/or sold PFAS to customers throughout New Jersey, and emitted PFAS into the environment in New Jersey, and Plaintiff's claims arise from and relate to CORTEVA, INC.'s substantial contacts in New Jersey.

43.    DUPONT DE NEMOURS INC is subject to personal jurisdiction in this case because, at all times relevant to this litigation, DUPONT DE NEMOURS INC produced,

9

manufactured, marketed, distributed, utilized, and/or sold PFAS to customers throughout New Jersey, and emitted PFAS into the environment in New Jersey, and Plaintiff's claims arise from and relate to DUPONT DE NEMOURS INC's substantial contacts in New Jersey.

44.     DUPONT SPECIALTY PRODUCTS USA, LLC is subject to personal jurisdiction in this case because, at all times relevant to this litigation, DUPONT SPECIALTY PRODUCTS USA, LLC produced, manufactured, marketed, distributed, utilized, and/or sold PFAS to customers throughout New Jersey, and emitted PFAS into the environment in New Jersey, and Plaintiff's claims arise from and relate to DUPONT SPECIALTY PRODUCTS USA, LLC's substantial contacts in New Jersey.

45. Solvay is subject to personal jurisdiction in this case because, at all times relevant to this litigation, Solvay produced, manufactured, marketed, distributed, utilized, and/or sold PFAS to customers throughout New Jersey, and emitted PFAS into the environment in New Jersey, and Plaintiffs' claims arise from and relate to Solvay's substantial contacts in New Jersey.

46. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) since a substantial part of the events or omissions giving rise to the claims plead in this Complaint occurred in the District of New Jersey.

## VI.   STATEMENT OF FACTS

47.     Plaintiff TAMMY O'LEARY suffered from personal injuries, pain and suffering, emotional distress, disability, and loss of enjoyment of life's pleasures as discussed above.

48.     The sections that follow detail some of the acts and omissions proximately causing

10

the contamination of Plaintiff's community and the injuries from which she suffer.

**Poly- and perfluoroalkyl Substances ("PFAS")**

49.     Plaintiff's injuries described above all were proximately caused by the Defendants' misconduct, including their intentional manufacturing, use, discharge, and/or disposal of PFAS, including perfluorononanoic acid ("PFNA"), perfluorooctanoic acid ("PFOA"), Surflon, ("PFOS"), and their replacement compounds, including but not limited to PFPE-DCAs, ClPFPECAs, MFS, BFS, and hexafluoropropylene oxide dimer acid (HFPO-DA) and related compounds, marketed under the name "GenX."

50.     The United States Environmental Protection Agency ("EPA") has identified 3M as the dominant global producer of PFOA and related chemicals.

51.      3M manufactures at least eighty-five (85%) percent of total worldwide volumes of PFOA and related chemicals.

52.      Poly- and perfluoroalkyl substances ("PFAS") are man-made chemicals.

53.      PFAS have been manufactured and used in the United States since the 1940s.

54.      PFAS have fire-resistant properties.

55.      PFAS act as oil, grease, and water repellants.

56.      PFAS have been used to make many household products such as Teflon®, Gore-Tex®, Stainmaster®, Scotchgard®, and Tyvek®.

57.      PFAS compounds are a substantial threat to the environment and human health.

58.      Some PFAS have been classified as carcinogenic.

59.      Studies report that PFAS exposure have the capacity to cause illness and injuries including but not limited to testicular cancer, kidney cancer, breast cancer, brain cancer, liver cancer, autoimmune disorders, endocrine disorders, reproductive harm,

11

developmental and genetic defects to fetuses, developmental defects including to breastfed babies, reduced vaccine response, increased cholesterol, and increased liver enzymes.

60.     PFAS compounds are resistant to degradation.

61.     PFAS compounds persist indefinitely in the environment.

62.     PFAS compounds bioaccumulate in living tissue.

63.     People who consume PFAS via drinking water and are otherwise exposed accumulate increasing concentrations of PFAS in their blood.

64.     For decades, Defendants and their predecessors in interest have known (or should have known) of the highly toxic characteristics of PFAS.

65.     The New Jersey Department of Environmental Protection ("NJDEP") has devoted and is continuing to expend substantial resources to identify and investigate the presence of PFAS in New Jersey's environment, as well as monitor, treat, clean up, and/or remove PFAS in impacted areas.

66.     The NJDEP has recognized that PFAS "can cross the placenta and reach the developing fetus. When drinking water is contaminated, PFAS exposures to infants from prepared formula and especially through breast milk are much higher than in adults. These higher exposures are of concern because the fetus and infant are sensitive to the developmental effects of PFAS."

67.     NJDEP also has recognized that PFAS including PFOA, PFOS and PFNA cause adverse health effects.

68.     The New Jersey Drinking Water Quality Institute Health Effects Subcommittee has concluded that PFOA, PFOS and PFNA cause adverse health

effects.

69.     Chemicals including but not limited to "GenX" have been substituted by Defendants in lieu of their PFAS chemicals. GenX is a shorter-chain PFAS, promoted as a safer alternative on the theory that shorter-chain compounds bioaccumulate less in human tissue.

70.     Beginning in 2013, DuPont replaced its production and use of PFOA with GenX chemicals.  Although GenX differs structurally from PFOA and PFOS by having a shorter carbon chain, it retains the defining chemical feature of PFAS compounds: multiple carbon–fluorine bonds, among the strongest bonds in organic chemistry. As a result, GenX is highly resistant to environmental degradation and is functionally "persistent," earning its classification as a "forever chemical."

71.     Environmental monitoring demonstrated that GenX, like PFOA and PFOS, is highly mobile in water, difficult to remove through conventional treatment processes, and capable of contaminating drinking water supplies.

72.     These replacement chemicals are being inaccurately touted as short-chain and having shorter half- lives.

73.     However, these replacement chemicals do not break down in the environment.

74.     They have also been detected in drinking water, groundwater, and surface waters. Widespread releases from DuPont and later Chemours facilities resulted in measurable GenX concentrations in surface water, groundwater, and public drinking water systems.

75.     Subsequent toxicological studies and regulatory assessments contradicted claims that GenX was substantially safer than legacy PFAS. Key findings include:

   a.  Hepatotoxicity: GenX causes liver enlargement, liver enzyme disruption, and

cellular changes at low exposure levels, mirroring effects observed with PFOA.

b.   Developmental and reproductive toxicity: Animal studies show reduced fetal growth, developmental delays, and increased neonatal mortality.

c.   Immune system effects: Evidence indicates immune suppression and altered immune responses, consistent with PFOS and PFOA outcomes.

d.   Carcinogenic potential: Regulatory agencies have identified tumor formation in laboratory animals and classified GenX as a likely human carcinogen under established risk-assessment frameworks.

76.      Several studies concluded that GenX exhibits equal or greater toxicity than PFOA on a dose-adjusted basis, undermining the premise that shorter-chain length equates to reduced health risk.

77.      Studies have shown that exposure to GenX has negative health effects, suggestive of cancer, on the kidney, blood, immune system, developing fetuses, and especially in the liver following oral exposure.

78.      Regulatory bodies, including the U.S. Environmental Protection Agency and state environmental agencies, have acknowledged that GenX poses serious health risks at extremely low concentrations, leading to health advisory levels measured in parts per trillion—comparable to or more stringent than those established for PFOA and PFOS.

79.      In 2020, the New Jersey Department of Environmental Protection passed regulations setting the maximum allowable concentration for GenX in drinking water at 10 parts per trillion (ppt), lower than the limits set for PFOA, PFOS and PFNA.

80.      In 2009, EPA issued preliminary health advisory values for PFOA and PFOS in drinking water of 400 parts per trillion ("ppt") and 200 ppt, respectively.

14

81.    In 2016, EPA lowered its advisories for PFOA and PFOS to 70 ppt collectively total in further recognition of their extreme danger at even the most miniscule doses.

82.    In 2018 the United States Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR") released draft minimum risk levels (the amount of a chemical a person can eat, drink, and breath each day without a detectable health risk) of 21 ppt for PFOA and PFNA, and 14 ppt for PFOS.

83.    NJDEP has adopted a specific groundwater Quality Standard ("GWQS") of 10 ppt for PFNA and a Maximum Contaminant Level ("MCL") of 13 ppt.

84.    NJDEP added PFNA to its List of Hazardous Substances on January 16, 2018.

85.    On March 13, 2019, the NJDEP established interim specific groundwater quality criteria for PFOA and PFOS of 10 ppt.

86.    In 2020, the NJDEP passed regulations setting the maximum allowable concentration for GenX in drinking water at 10 ppt.

87.    NJDEP has proposed adding PFOA and PFOS to the List of Hazardous Substances.

88.    NJDEP also issued a Statewide PFAS Directive, Information Request and Notice to Insurers against entities including Defendant E.I. du Pont de Nemours & Company, Dowdupont, Inc., DuPont Specialty Products USA, LLC, Defendant The Chemours Company FC, LLC, Defendant The Chemours Company, and Defendant The 3M Company "to notify them that the Department believes them to be responsible for the significant contamination of New Jersey's natural resources, including the air and waters of the State, with poly- and perfluoroalkyl substances ("PFAS")…" which encompass the air and water utilized by plaintiff. Attached hereto as **Exhibit A** is a true and correct copy

15

of the NJDEP Directive.

89.     NJDEP declared that: "DuPont has not been working in good faith to address the contamination it released into New Jersey's environment. Instead, DuPont knowingly concealed the true nature of the chemicals it discharged, while simultaneously moving forward with a corporate reorganization that moved its 'performance chemicals' business (including its PFAS-related product lines), … and the associated liabilities to Chemours [Co.] and Chemours FC and away from DuPont (and tens of billions of dollars of its assets). DuPont has concealed from the Department and the community the extent and nature of the environmental injuries its contaminants caused."

90.     NJDEP also declared that "[b]oth DuPont and The 3M Company ("3M") put their profits above the public health, safety, and the environment of New Jersey."

91.     The NJDEP sued companies including Defendants, seeking to compel action to clean up the contamination at and around the site, including addressing impacts to drinking water, reimbursing the State for the costs of work that the NJDEP had already undertaken, and paying damages to the State to compensate the public for the injuries to natural resources caused by the facility's operations.

92.     New Jersey's Attorney General and NJDEP Commissioner has announced a settlement of up to $450 million with 3M to resolve the State's lawsuits and a Statewide Directive to address damage to the State's water and other natural resources from PFAS chemicals.

93.     NJDEP reports that on August 4, 2025, NJDEP reached a proposed settlement with entities including EIDP, Inc. (f/k/a E.I. du Pont de Nemours and Company), Corteva, Inc., DuPont de Nemours Inc., DuPont Specialty Products

16

USA, LLC, The Chemours Company, and The Chemours Company FC, LLC ("Chemours FC") that will supply up to $875 million to compensate the citizens of New Jersey for injuries to their natural resources, to fund projects to address PFAS and other contamination of drinking water supplies and other environmental media, and to pay for costs, penalties, and punitive damages.

94.    Defendants committed acts and omissions with respect to PFAS with actual malice and/or with a wanton and willful disregard of people who foreseeably might be harmed by those acts or omissions.

95.    This conduct was performed with greed and in callous disregard of the public health as well as Plaintiff's health, life, and well-being, in order to maximize profit, avoid necessary expense, to promote sales of their products and to reduce or eliminate their obligations to otherwise remediate or prevent the discharge of PFAS into the environment and Plaintiff's water and private wells.

### Defendants' Contamination of Groundwater and Drinking Water

96.    For decades, Defendants knew or should have known of the severe and adverse health and environmental effects and impacts of PFAS.

97.    Despite that knowledge, Defendants continued to use PFAS in their products and release them into the environment.

98.    From as early as the 1970s, Defendant 3M knew that PFOA and PFOS were harmful to people and the environment based on its own studies.

99.    Defendant 3M knew that PFAS had the capacity to and foreseeably would leach into groundwater and contaminate the environment.

100.    As early as 1960, an internal 3M memo admitted that its chemicals "[would]

17

eventually reach the water table and pollute domestic wells."

101.    3M actively sought to suppress scientific research on the hazards associated with PFAS products.

102.    3M intentionally mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health, and environmental risks of its PFAS products.

103.    At least one scientist funded by 3M reported his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

104.    From studies of its own workers, Defendants E.I.D.P. and Chemours knew that PFAS including PFOA were toxic to people.

105.    Defendants E.I.D.P. and Chemours knew that PFAS including PFOA were being discharged into the environment.

106.    Defendants E.I.D.P. and Chemours failed to disclose the risks to regulators, the public or the Plaintiff's.

107.    In a 2003 report on E.I.D.P. and Chemours' Penns Grove, New Jersey chemical production facility Chambers Works, E.I.D.P. and Chemours disclosed that PFOA was present in groundwater throughout the facility and at the perimeter up to 46,000 ppt.

108.    However, E.I.D.P. and Chemours falsely characterized those results as showing "very low levels" and that "PFOA is being contained on-site by the site groundwater containment system."

109.    In 2006, the NJDEP conducted its first statewide occurrence study of PFAS in drinking water.

18

110.    That study revealed that 65% of sampled drinking water sources had PFOA compounds present, and 30% had PFOS compounds present.

111.    In the samples tested, PFOA was detected up to 100 ppt, PFOS was detected up to 43 ppt, and PFNA was detected up to 96 ppt.

112.    NJDEP sampled 992 private wells as of June 2018 for PFAS and detected the following:

   a. PFOA in 427 wells (43%) with 284 of those wells having levels of PFOA exceeding the proposed MCL for PFOA; and

   b. PFOS in 304 wells (31%) with 40 of those wells having levels of PFOS exceeding the proposed MCL for PFOS.

113.    In subsequent civil litigation and enforcement actions, evidence showed that Defendants were aware, or should have been aware, of GenX's hazardous properties prior to and during its deployment. Internal documents and regulatory submissions demonstrated that GenX was introduced as a functional substitute rather than a demonstrably safer alternative, despite internal toxicity data indicating significant risk.

114.    The GenX substitution illustrates a pattern of regrettable substitution, in which a regulated hazardous substance is replaced by a chemically similar compound with comparable toxicity and persistence. Courts, regulators, and policymakers have increasingly treated GenX not as a distinct and safer innovation, but as part of a continuum of PFAS liability, subject to similar standards of care, disclosure obligations, and environmental responsibility as PFOA, PFOS and PFNA.

115.    Although GenX was introduced as a shorter-chain replacement ostensibly to mitigate the known harms of PFOA and PFOS, subsequent scientific, regulatory, and

19

legal findings reflect that GenX is similarly persistent, similarly toxic, and capable of causing serious adverse health effects at low exposure levels.

116.    The replacement did not materially reduce risk and instead extended PFAS-related contamination and liability under a different chemical name.

### c.    The Chambers Works Facility

117.    For over a century, from 1891 to 2015, E.I.D.P. and Chemours owned and operated Chambers Works, 67 Canal Road and Route 130, located in Pennsville and Carneys Point Townships, New Jersey.

118.    PFOA was used at Chambers Works beginning in the 1950s to, among other things, manufacture fluoroelastomers, perfluoroelastomers and specialty fluoroelastomers used in a variety of consumer and other products for their chemical non-stick and heat-resistant properties.

119.    Telomers were used and manufactured at Chambers Works.

120.    PFOA is a by-product of the telomer manufacturing process.

121.    PFNA is also a by-product of manufacturing process at Chambers Works.

122.    PFOS is also by-product of manufacturing process at Chambers Works.

123.    At relevant times 3M supplied E.I.D.P. and Chemours with PFOA.

124.    E.I.D.P. and Chemours also accepted large quantities of PFOA-containing waste from off-site facilities and discharged this and other toxic waste along with wastewater from its on-site PFOA- related processes through its wastewater treatment plant.

125.    As a result of its operations, for decades, E.I.D.P. and Chemours released massive amounts of PFOA as well as other PFAS, including PFNA, GenX, and PFOS, from Chambers Works into the surrounding air, water and soil, contaminating the site, off-site

20

properties including Plaintiff's, and New Jersey's natural resources.

126. In 2015, DuPont transferred its Chambers Works facility to Chemours.

127. DuPont continued to operate at the location pursuant to an industrial lease through which DuPont was the tenant and Chemours FC was the landlord.

128. Chemours accepted the transfer of DuPont's Chambers Works facility with the knowledge that the site had been wrongfully contaminated with PFAS and other toxic substances.

129. Chemours accepted the transfer of DuPont's Chambers Works facility with the knowledge that it was discharging PFAS into the surrounding air and water contaminating off-site properties including Plaintiff's, and New Jersey's natural resources.

130. Sampling of residential drinking water wells in the surrounding area revealed contamination at least five miles away from the Chambers Works facility with a substantial number of wells exceeding applicable screening criteria for concentrations of PFOA, PFNA, or PFOA and PFOS combined. GenX also has been found in private drinking water wells in the area surrounding the Chambers Works site.

131. NJDEP has declared that: "DuPont has not been working in good faith to address the contamination it released into New Jersey's environment. Instead, DuPont knowingly concealed the true nature of the chemicals it discharged, while simultaneously moving forward with a corporate reorganization that moved its 'performance chemicals' business (including its PFAS-related product lines), the [Chambers Works facility] itself, and the associated liabilities to Chemours [Co.] and Chemours FC and away from DuPont (and tens of billions of dollars of its assets). DuPont has concealed from the Department and

21

the community the extent and nature of the environmental injuries its contaminants caused."

132.    NJDEP also declared that "[both DuPont and The 3M Company ("3M") put their profits above the public health, safety, and the environment of New Jersey]."

133.    Defendants committed acts and omissions with respect to PFAS with actual malice and/or with a wanton and willful disregard of people who foreseeably might be harmed by those acts or omissions.

134.    This conduct was performed with greed and in callous disregard of the public health as well as Plaintiff's health, lives, and well-being, in order to maximize profit, avoid necessary expense, to promote sales of their products and to reduce or eliminate their obligations to otherwise remediate or prevent the discharge of PFAS into the environment and Plaintiff's private wells.

**Leonards' Lane**

135.    Solvay purchased and has owned the Leonard's Lane facility since approximately 1990.

136.    Surflon® is a commercial mixture of perfluorinated carboxylic acids composed primarily of PFNA (sometimes referred to by the number of Carbons as "C9"), but also containing PFAS with longer and shorter Carbon chains (*e.g.,* C8 [with 8 Carbons], and C10-20 [with 10 to 20 Carbons]).

137.    Solvay used Surflon® S-111, composed of approximately 74 percent PFNA, at the Leonard Lane Facility, as a surfactant in several chemical processes and as a manufacturing aid in the production of polyvinalidene fluoride (PVDF), a specialty plastic that has numerous uses and applications.

22

138.    Surflon® was used at the Leonard Lane Facility as a processing aid in the manufacture of PVDF and other products by Solvay from approximately 1990 to 2010.

139.    From approximately 1985-1990, Surflon® was similarly used at the site as a processing aid in the manufacture of PVDF and other products.

140.    Solvay has reported using 275,730 pounds of Surflon® at the Leonard Lane Facility between 1991 and 2010.

141.    Solvay has admitted to the New Jersey Department of Environmental Protection that 86.6% of the Surflon® used at the Leonard Lane Facility was released into the environment through emissions to water and air, with 164,408 pounds discharged to water and 73,632 pounds emitted to the atmosphere.

142.    Solvay reported that it disposed of approximately 2% of the Surflon® used at the Leonard Lane Facility into unidentified landfills.

143.    As discussed below, for years, Solvay also utilized another Toxin, NaPFO.

144.    Solvay continued using Surflon® at the Leonard Lane Facility, even after production of Surflon® ceased in approximately 2008.

145.    According to the New Jersey Department of Environmental Protection ("NJDEP" or "Department"), in 2007, while Solvay was using and discharging Surflon® at the Leonard Lane facility, PFNA was detected in surface water samples collected from the Delaware River downstream of that facility up to 976 parts per trillion ("ppt").

146.    PFUnDA or perfluoroundecanoic acid or C11, a component of Surflon®, was also detected in these areas.

147.    Solvay's emission of more than 70,000 pounds of Surflon® from air emission stacks at the Leonard Lane Facility contributed to soil contamination many miles away

23

from the Leonard Lane Facility.

148. Solvay began PVDF production at the Leonard Lane Facility in approximately 1990.

149. Solvay also used sodium perfluorooctanoate ("NaPFO") provided by Defendant 3M as a processing aid in the manufacture of PVDF between approximately 1995 and 2003.

150. NaPFO degrades into PFOA (C8).

151. Solvay continued using NaPFO at the Leonard Lane Facility until at least 2003 after 3M halted production of NaPFO.

152. Solvay used at least 23,241 pounds of NaPFO at the Leonard Lane Facility between approximately 1995 and 2003.

153. Solvay reported that approximately 97% of the NaPFO used at the Leonard Lane Facility between 1995 and 2003 was released into the environment through emissions to water and air.

154. This included 20,682 pounds discharged to water and 1,861 pounds emitted to the air.

155. From the 1990's until at least 2003, Solvay also manufactured polytetrafluoroethylene ("PTFE") at the Leonard Lane Facility.

156. The manufacture of PTFE used PFOA.

157. In or about 2003 and thereafter, Solvay used PTFE at the Leonard Lane Facility containing PFOA.

158. NJDEP 2017 testing of surface water samples collected in the Delaware River upstream and downstream from the Leonard Lane Facility, including into the back reaches of tidal tributaries and creeks, revealed the presence of PFNA at concentrations up to 111

ppt in tidal tributaries.

159.    Between 2007 and 2009, the Delaware River Basin Commission conducted a multi-year survey of contaminants of emerging concern in the Delaware River.

160.    The Delaware River Basin Commission study found PFNA in the Delaware River water up to 976 ppt near the Leonard Lane Facility at a concentration that was higher than had been reported in surface water anywhere else in the United States or worldwide.

161.    NJDEP-mandated testing of groundwater revealed PFNA concentrations of up to 14,000 ppt and PFOA concentrations of up to 1,600 ppt.

162.    NJDEP stated that the elevated PFNA levels found in the area surrounding the Leonard Lane Facility have not been detected elsewhere in New Jersey.

163.    The highest PFNA concentration in New Jersey were found near the Leonard Lane Facility.

164.    The PFNA-PFUnDA-PFTrA ratio in Surflon is distinct, and it is consistent with the ratios of these chemicals found in environmental media in and around the Leonard Lane Facility but not reported elsewhere in New Jersey.

165.    Solvay released PFAS including but not limited to PFOA, PFNA, and Surflon which as noted contains PFAS including C9, C8, and longer Carbon chain (C10+) PFAS from the Leonard Lane Facility into the air, water, and soil proximately causing harm to the Plaintiff.

166.    Solvay was involved for years in suppressing internal scientific findings on health risks of Toxins.

167.    Documents Solvay provided to the EPA in 2019, but that it did not contemporaneously share with the NJDEP, show that Solvay had been testing workers'

blood since at least 2011 (i.e., approximately 8 years earlier), and that Solvay knew that chloroperfluoropolyether carboxylate compounds bioaccumulated. Solvay's European affiliate companies, which also utilized PFAS, also conducted blood screening of workers in the early 2000s and confirmed that workers had elevated PFOA levels in their blood. According to press reports, based on an investigation of the Environmental Working Group, Solvay knew in 2011 that PFAS chemicals accumulate in human blood but did not disclose that to the EPA until 2019.

168.    According to a January 26, 2021, letter from the Environmental Working Group to the USEPA, Solvay withheld information from the EPA about substantial risks from PFAS for years. According to that letter, "Solvay was aware for more than six years of the substantial risk to human health and the environment that its replacement PFAS compounds posed before it submitted that information to the EPA." According to *Consumer Reports*, internal Solvay documents reveal that the company has known of potentially severe health risks for at least 15 years.

169.    Despite knowing about elevated PFAS in workers' blood in the United States and abroad, Solvay delayed reporting data about PFAS- related toxicity to the EPA for years, until after claiming to phase out of the process chemicals.

170.    Solvay, as discussed below withheld toxicity data on PFAS replacement compound use until approximately 2021.

171.    At all relevant times, Solvay had access to research and scientific and medical personnel with knowledge and expertise far exceeding that possessed by the general public and Plaintiff, respecting the adverse health effects of the Toxins.

172.    These personnel included toxicology personnel at a Solvay European affiliate,

26

which used PFAS including PFOA for decades, and which by at least the 1990s, was participating in trade group meetings with scientists from companies including 3M, addressing the toxicity of PFAS chemicals.

173.    By the 1990s, Solvay knew or should have known about scientific research documenting the presence of organo fluorides in human blood.

174.    Toxicologists working at Solvay's European affiliates were active members in trade groups with other PFAS consumers and manufacturers like 3M, who were studying PFAS' adverse health effects.

175.    Solvay was asked in the 1990s to join other trade group members in conducting PFAS-related scientific research, and Solvay had objected to the cost of proposed research.

176.    Rather than promptly disclosing the adverse health effects of Toxins and investigating its own contamination, for years, Solvay withheld from the public research Solvay was conducting internally about the Toxins.

177.    As NJDEP began to learn of widespread PFNA pollution at Solvay's Leonard Lane plant, Solvay argued that it was not responsible for some or all of the contamination, in order to delay or avoid clean-up responsibilities.

178.    While it was using Surflon®, Solvay also failed to conduct thorough soil and environmental testing. Solvay knew or should have known that had they conducted thorough environmental testing, it would have revealed Toxin- contaminated soil and water, that could have obligated duties to report findings to regulators.

179.    At all relevant times, Solvay had or should have had knowledge respecting the safe handling of the Toxins and respecting adverse effects including blood abnormalities, benign tumors, diarrhea, gastrointestinal distress, and bioaccumulation of PFAS.

27

180.    At all relevant times, Solvay also knew or should have known that fluoropolymers should not be discharged into waterways, lakes, or streams.

181.    At all relevant times, Solvay knew or should have known that other companies were facing liability and experiencing negative publicity about PFAS-related contamination and knew or should have known that Solvay could face similar consequences if the public learned of its contamination of the air, water, and soil surrounding the Leonard Lane facility with PFAS.

182.    For years, while Plaintiff was being exposed to PFAS, Solvay endeavored to avoid, delay, and limit public awareness of the nature and extent of the contamination of the Leonard Lane site and surrounding areas. Solvay, at various times, sought to argue to the NJDEP that others were responsible for PFNA contamination near its facility.

183.    In 2017, NJDEP and the USEPA Office of Research and Development (ORD) began a collaborative investigation of PFAS in the environment in the area of Southwestern New Jersey where PFAS was detected.

184.    Using non-targeted analysis, multiple congeners of chloroperfluoropolyether carboxylates ("ClPFPECAs") were tentatively identified in soil, surface water, and groundwater including private wells.

185.    These congeners contain between 7 and 15 carbons and are not short chain PFAS.

186.    ClPFPECAs were later detected in other media in this vicinity including vegetation and fish.

187.    These compounds' identification as ClPFPECAs was supported by Solvay Specialty Polymers Italy's having submitted information on ClPFPECAs with the same structure to the European Food Safety Authority (EFSA) for approval for use in processing

28

of fluoropolymers used in food contact materials.

188. Based on that information, the chemical structure and CAS RN were identified by researchers as "Solvay's product."

189. Further, five of the nine ClPFPECA congeners detected in New Jersey soil also were detected by USEPA ORD in water samples from a river downstream of a Solvay Specialty Polymers fluoropolymer manufacturing facility in Italy.

190. On March 25, 2019, the NJDEP issued a publicly available Statewide PFAS Directive, Information Request and Notice to Insurers (the "Directive") to several chemical manufacturers.

191. A NJDEP 2019 Directive also required Solvay, among other things, to provide the Department with information regarding additional PFAS compounds, which it was using in its manufacturing operations to replace legacy PFAS chemicals.

192. In response, Solvay disclosed to the Department that it has emitted and discharged additional PFAS compounds at the site to New Jersey's air and water for years.

193. Solvay had begun using PFAS replacement compounds before it stopped using either PFNA or PFOA.

194. Solvay continued to use, emit, and discharge PFAS replacement compounds at the Leonard Lane/West Deptford facility up to and including at least 2020.

195. Solvay took the position that the specific chemical identities of its PFAS replacement compounds that it used, emitted, and discharged at the site, as well as emissions information, Safety Data Sheets, and toxicology and toxicokinetic studies describing the health and environmental risks they pose, were confidential, trade secret, and proprietary.

196.    In so doing, Solvay effectively barred the NJDEP from disclosing information to the public and the medical and scientific community about its PFAS replacement compounds.

197.    Solvay eventually provided NJDEP with estimated annual amounts of these PFAS replacement compounds used and released into the air and water from approximately 1996-2018.

198.    More than 1,000 kg of these PFAS replacement compounds were released annually between 2002 and 2018.

199.    Solvay estimated releases of >10,000 kg of these PFAS in multiple years, and release of large amounts in some years before 2010 when long-chain PFAS were still being used.

200.    As Solvay had recognized that it would need to cease using of NaPFO and Surflon®, as scientists and regulators were beginning to ask questions about their toxicity, Solvay began ramping up usage of PFAS replacement compounds, while concealing internal studies showing that the PFAS replacement compounds exhibited significant toxicity.

201.    Solvay also failed to provide the Department with publicly available technical grade analytical standards which would enable laboratory instruments to quantify these PFAS replacement compounds in environmental samples.

202.    According to a 2020 article entitled "Nontargeted mass spectral detection of chloroperfluoropolyether carboxylates in New Jersey Soils," some of the PFAS replacement compounds that Solvay likely used at the site are chloroperfluoropolyether carboxylates ("ClPFPECAs").

30

203.    Like PFNA and PFOA, ClPFPECAs have been identified in the environment including in Gloucester and Salem counties.

204.    In 2020, EPA reported to the Department that it had detected ClPFPECAs in water samples collected from private potable wells near the site.

205.    Upon information and belief, ClPFPECAs pose risks to public health and the environment similar to those posed by PFOA and PFNA.

206.    The NJDEP has stated that ClPFPECAs are associated with numerous health endpoints in occupationally exposed workers, including increased serum lipids and liver enzymes, decreased immunoglobulins, changes in endocrine parameters, and others. See https://www.nj.gov/dep/wms/bears/docs/ClPFPECAs-factsheet2021Final.pdf.

207.    The NJDEP also has stated that "ClPFPECAs were detected in private wells in the vicinity of Solvay's West Deptford facility, and levels in some of these wells are estimated to be several hundred parts per trillion (ng/L). ClPFPECAs have been detected in soil, vegetation and sediment (unpublished data from NJDEP/EPA study) in Solvay's vicinity. They have also been discharged to air and to water." Id. (citations omitted).

208.    NJDEP further wrote that "[d]irect and/or indirect potential human exposure is possible from all these media" and that "[t]he most sensitive toxicological effects (i.e., effects that occurred at the lowest dose) in the available toxicology studies were observed in male rats in a 13-week study of a mixture of ClPFPECA congeners of different chain lengths (RTC, 2016). Increased relative liver weight, decreases in red blood cell parameters, and hepatocellular micro- and macrovesicular vacuolation likely due to steatosis were identified as endpoints that are sensitive, adverse or precursor to adverse, and relevant to humans" Id. (citations omitted).

31

209.    In addition to ClPFPECAs, Solvay utilized and released into the air, water, and environment another alternative PFAS, perfluoropolyether dicarboxylates (PFPE-DCAs), both before and after its use of ended.

210.    ClPFPECAs and PFPE-DCAs are at least as bio-accumulative and toxic in rats as long-chain perfluoroalkyl acids (PFAAs).

211.    ClPFPECAs and PFPE-DCAs are at least as bioaccumulative and toxic as PFOA and PFNA.

212.    After issuing a State-wide directive to companies, including Solvay, ordering them to address their contribution to the injury of numerous environmentally sensitive natural resources, including regional potable groundwater resources, the companies failed to fully comply with the NJDEP's orders and litigation followed.

213.    In November 2020, the NJDEP sued companies including Solvay in State Court, seeking to compel more swift and immediate action to clean up the contamination at and around the site, including addressing impacts to drinking water, reimbursing the State for the costs of work that the NJDEP had already undertaken, and paying damages to the State to compensate the public for the injuries to natural resources caused by the facility's operations.

214.    The NJDEP alleged that in addition to emitting Surflon®, containing PFNA and PFOA "forever chemicals" that are highly mobile, bioaccumulate, and persist indefinitely in the environment unless remediated, the Leonard Lane facility also discharged other PFAS, including monofunctional surfactants (MFS) and bifunctional surfactants (BFS).

215.    Those discharges on information and belief also contaminated Plaintiffs' environment and substantially contributed to and/or exacerbated Plaintiffs' illnesses and

32

condition.

216.    Solvay provided information to USEPA ORD indicating that ClPFPECA products used in New Jersey contain six congeners with 8 to 17 Carbon atoms, the PFPE-DCAs products typically contain nine congeners with 9 to 12 Carbon atoms, and that there are no CAS RNs for the individual congeners.

217.    ClPFPECA congeners in addition to the six acknowledged in product information from Solvay were detected in environmental media near the facility.

218.    Only after Solvay ceased use of PFAS replacement Compounds in its Leonard Lane facility in approximately 2021, did it make public information previously deemed confidential on its PFAS replacement Compounds including CAS RNs, Chemical forms, annual use and discharge and toxicology studies, albeit with some redactions.

219.    Third party validated analytical reference standards for the six ClPFPECA congeners stated to present in Solvay's products were eventually made commercially available by Solvay but are not available for PFPE-DCAs.

220.    In sampling performed by Solvay at the Leonard Lane or West Deptford site, PFPE-DCAs and ClPFPECAs were detected in the soil and groundwater onsite and in surrounding areas, with ClPFPECAs at up to 670,000 ng/L and PFPE-DCAs at up to 156,000 ng/L reported in onsite monitoring wells.

221.    NJDEP became aware of the existence of mammalian toxicology studies of the PFAS replacement Compounds from Safety Data Sheets Solvay provided many years after their usage began, in response to a 2019 legal directive.

222.    Safety Data Sheets state that repeated dose exposure to these PFAS replacement Compounds caused specific target organ toxicity in the liver in oral rat studies with No

33

Observed Effect Levels (NOEL) of <.3mg/kg/day in a 4-week study of ClPFPECAs, and .5mg/kg/day in a 4-week study and .3mg/kg/day in a 13-week study of PFPE-DCAs.

223.     The toxicology studies reporting such data were not initially submitted by Solvay to NJDEP. Instead, Solvay provided NJDEP with numerous unpublished industry-sponsored contract laboratory studies of mammalian acute and repeated dose toxicology bacterial mutagenicity, and ecological toxicity for both types of PFAS replacement Compounds only after NJDEP made a follow-up request for all toxicology data on these PFAS.

224.     Solvay failed to make these studies public until use of its PFAS replacement Compound ended, and even then, it redacted trade names, and in a fashion that lay people such as the Plaintiffs could not comprehend.

225.     Despite obtaining submitting including studies of workers with occupational exposures to ClPFPECAs, including blood serum levels, elimination half-life data, and associations with multiple health endpoints, Solvay did not promptly provide that information to NJDEP, or inform the NJDEP of its existence.

226.     Additional materials that Solvay did not promptly provide to NJDEP included four toxicology studies for PFPE-DCAs, which included an acute rat oral toxicity study and three genotoxicity studies.

227.     Furthermore, Solvay did not contemporaneously share with NJDEP research by scientists from Solvay S.A. in Belgium and France, reporting a non-regulatory corporate occupational exposure limit of 0.0035 mg/m³ in air for ClPFPECAs based on "effects on liver (and lungs at higher dose levels)" in rats.

228.     This air concentration is 14 to 6,200 times below Solvay S.A.'s occupational

34

exposure limits for the seven other chemicals included in the publication.

229. Solvay advised the EPA that ClPFPECAs have an estimated human half-life of 2.5-3 years based on biomonitoring data from exposed Solvay workers.

230. The later publication of this study concluded that the half-life of ClPFPECAs in these workers was similar to PFOA's half-life of 3.16 years.

231. Solvay's communication to the EPA in 2019 also reported statistical associations of an unusually large number of health endpoints with serum ClPFPECAs in exposed workers.

232. Many of the health effects associated with ClPFPECAs in workers were consistent with effects of ClPFPECAs in rats and with effects of other PFAS in laboratory animals and humans.

233. An unpublished study submitted by Solvay to the NJDEP in 2019 indicates that the half-lives of ClPFPECA congeners in rats are comparable to those of PFNA and PFOA.

234. In eight unpublished acute oral studies of ClPFPECAs dated 1996-2003 submitted by Solvay to NJDEP in 2019, the oral lethal doses to 50% of animals (LD50s) for ClPFPECAs in rats were 39-120 mg/kg.

235. LD50s for ClPFPECAs appear to be 5 to 50-fold lower than for PFOA, and 20- to 60-fold lower than for GenX, indicating that ClPFPECAs are much more acutely toxic in rats than other PFAS.

236. In approximately 2019, Solvay provided to NJDEP unpublished repeated dose studies of ClPFPECAs in rats (dated between 2006 and 2016).

237. In those studies, hepatic toxicity was the most sensitive and consistent toxicological effect, occurring at doses as low as 0.05mg/kg/day in the 13-week study.

238.    Hepatic toxicity is an established and sensitive effect of PFAS generally.

239.    ClPFPECAs also are associated with increased serum liver enzymes in human beings.

240.    Toxicological studies reflect that ClPFPECAs are equally or more potent than PFOA and PFNA for hepatic toxicity.

241.    Other toxicological effects of ClPFPECAs in the repeated dose studies included changes in relative weights and histopathological effects in multiple organs in addition to the liver, effects on serum lipids, and other clinical chemistry endpoints, and decreases in red blood cell parameters.

242.    In approximately 2019, Solvay also submitted to NJDEP two unpublished studies (dated 2005 and 2006) on the half-life of PFPE-DCAs in rats, reflecting that the half-lives of PFPE-DCAs were comparable to those of PFOA and PFNA.

243.    Unpublished repeated dose oral studies of PFPE-DCA congener mixtures (dated 2005 and 2006) also were submitted by Solvay to NJDEP in approximately 2019.

244.    Hepatic toxicity was a sensitive effect in these studies, like other PFAS, and occurred at doses as low as .13mg/kg/day in a 13-week study.

245.    Further effects in one or both studies included increased relative kidney weight, histopathological changes in the lung, increased serum triglycerides, and other clinical chemistry changes, and decreases in RBC parameters.

246.    Even after industry-sponsored studies demonstrated that these alternative PFAS are at least as bio-accumulative and toxic as the phased out long-chain PFAS, Solvay continued to utilize, emit, and discharge large volumes of ClPFPECAs and PFPE-DCAs into the surrounding community, while withholding research from government entities such as

NJDEP and the general public that could have been used to warn and protect Plaintiffs.

247. Following years of litigation by the NJDEP, a nearly $394 million settlement was reached, made effective through a Judicial Consent Order (JCO) entered on or about March 6, 2024, requiring Solvay to remediate its pollution and take steps to restore the environment and impacted resources.

248.

**d.    Defendants' Contamination of Groundwater, Surface Water, Drinking Water, Air and Soil**

249. For decades, Defendants knew or should have known of the severe and adverse health and environmental effects and impacts of PFAS.

250. Despite that knowledge, Defendants continued to use PFAS in products and release them into the environment.

251. From as early as the 1970s, Defendant 3M knew that PFOA and PFOS were harmful to people and the environment based on its own studies and review of relevant scientific and medical literature.

252. Defendant 3M knew that PFAS had the capacity to and foreseeably would leach into groundwater and contaminate the environment.

253. As early as 1960, an internal 3M memo admitted that its chemicals "[would] eventually reach the water table and pollute domestic wells."

254. 3M actively sought to suppress scientific research on the hazards associated with PFAS products.

255. 3M intentionally mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health, and environmental risks of its PFAS

products.

256.     At least one scientist funded by 3M reported his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

257.     From internal research, ongoing communications with 3M, and studies of its own workers, Defendants E.I.D.P. and Chemours knew that PFAS including PFOA were harmful to humans both alive and *in utero.*

258.     Defendants E.I.D.P. and Chemours knew that PFAS including PFOA, PFOS, PFNA, and GenX were being discharged into the environment, including the air, soil, groundwater, surface water and drinking or household water supply.

259.     Defendants failed to disclose the risks to regulators, the public, or the Plaintiff.

260.     In a 2003 report on Chambers Works, E.I.D.P. and Chemours disclosed that PFOA was present in groundwater throughout the facility and at the perimeter up to 46,000 ppt.

261.     However, E.I.D.P. and Chemours falsely characterized those results as showing "very low levels" and that "PFOA is being contained on-site by the site groundwater containment system."

262.     In 2006, the NJDEP conducted its first statewide occurrence study of PFAS in drinking water.

263.     That study revealed that 65% of sampled drinking water sources had PFOA compounds present, and 30% had PFOS compounds present.

264.     In the samples tested, PFOA was detected up to 100 ppt, PFOS was detected up to 43 ppt, and PFNA was detected up to 96 ppt.

38

265.    NJDEP sampled 992 private wells as of June 2018 for PFAS and detected the following:

266.    PFOA in 427 wells (43%) with 284 of those wells having levels of PFOA exceeding the proposed MCL for PFOA; and

267.    PFOS in 304 wells (31%) with 40 of those wells having levels of PFOS exceeding the proposed MCL for PFOS.

268.    In 2017, tests of drinking water from local sources in Salem County and Gloucester County revealed the presence of GenX chemicals. A New Jersey Department of Environmental Protection (NJDEP) investigation confirmed that DuPont was the source of the contamination.

269.    According to NJDEP and U.S. Environmental Protection Agency (EPA) reports, GenX was found in several public and private drinking water sources in the region, particularly around the Carney's Point area, where DuPont's facility is located.

270.    The contamination was detected in wells that supplied drinking water to both residential and industrial areas.

271.    Studies show that exposure to PFAS have the capacity to cause *inter alia* testicular cancer, kidney cancer, liver cancer, autoimmune disorders, endocrine disorders, genetic damage, breast cancer, endometriosis, diabetes, developmental birth defects to fetuses, gastrointestinal illness, brain tumors, reproductive harm, developmental defects including to breastfed babies, reduced vaccine response, increased cholesterol, and increased liver enzymes.

272.    The routes of exposure to which Plaintiff was exposed to the PFAS include but are not limited to: a) the ingestion of drinking water, b) the inhalation of vapors and

particulate matter, and c) dermal contact and skin absorption.

273.     Defendants' misconduct (both individually and collectively) and the resulting wrongful exposures proximately caused Plaintiff's injuries and damages as described above. As a consequence, each Defendant is individually and jointly and severally liable to Plaintiff for both compensatory and punitive damages.

274.     At all material times hereto, Defendants

a.  knew or should have known that their PFAS would contaminate the environment including the air, soil, and groundwater and contaminate the drinking, neighborhood, and household water of residents in surrounding communities, including Plaintiff;

b.  knew or should have known that PFAS were hazardous substances and the reckless, and/or wanton and willful discharge of those chemicals into the environment and surrounding communities would eventually reach Plaintiff's property, soil, air, and drinking and household water wells thus exposing Plaintiff and others to high and injurious concentrations of the hazardous chemicals;

c.  knew or should have known of the health and environmental impacts of PFAS for decades but continued to use them in products and release them into the environment;

d.  knew or should have known that PFOA, PFNA,  PFOS and GenX and their constituents were harmful to people and the environment based on their own studies and research of others;

e.  despite actual or constructive knowledge of its chemicals' toxicity to humans and the environment, proactively sought to conceal that information from the public;

40

f.   despite actual or constructive knowledge of its chemicals' toxicity to humans and the environment, Defendants proactively misrepresented the chemicals' hazardous properties, including knowingly and purposefully withholding material information from regulators and governmental agencies;

g.   even after Defendants acquired actual knowledge that they were causing groundwater, soil, air, and drinking water contamination and thus exposing nearby residents to its PFAS, including Plaintiff, Defendants continued their operations and continued discharging these PFAS into the environment and exposing residents in surrounding communities, including Plaintiff, in reckless and conscious disregard for the serious health and safety risks associated with such exposure;

h.   committed acts and omissions with respect to PFAS with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions

i.   knowingly, continuously, and with conscious indifference to the rights of residents in surrounding communities, including Plaintiff, to have access to clean air, soil, water, and drinking water, caused, allowed, or permitted the discharge of large quantities of PFAS into the environment, air, soil, and groundwater, had no justification for doing so, and made no effective effort to alleviate the problem or warn the surrounding community;

j.   engaged in the above conduct motivated by greed and in deliberate and knowing disregard of their duties to Plaintiff and all similarly situated individuals;

275.   Defendants' acts and omissions as set forth in the preceding paragraphs

41

demonstrate their reckless and conscious disregard the health, safety, and welfare, of residents in the community, including Plaintiff.

276.     As a direct and proximate result of Defendants' conscious and deliberate disregard for the health, safety, and welfare of residents in surrounding communities, including Plaintiff's, suffered illness, injuries, emotional distress, medical costs and economic damages, as described above.

277.     The aforesaid conduct of Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of residents in surrounding communities, including Plaintiff, thereby entitling them to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

278.     Defendants' actions showed willful misconduct, malice, fraud, wantonness, and/or oppression, and demonstrates conscious indifference to the consequences.

## CLAIMS FOR RELIEF

### Count I: Negligence
### Plaintiff v. All Defendants

279.     Plaintiff incorporates the allegations contained in all paragraphs of this Complaint as if fully restated herein.

280.     Defendants knew or should have known that the use of the PFAS and/or the discharge of PFAS into the air, soil, groundwater and drinking water was hazardous to human health and the environment.

281.     Defendants knew or should have known that it was unsafe and/or unreasonably dangerous to discharge PFAS into the environment in proximity to surrounding

residential communities, including Plaintiff's residence.

282. Defendants knew or should have known that exposure to the PFAS could proximately cause or aggravate the injuries and illnesses from which Plaintiff suffers.

283. Defendants should have foreseen that Plaintiff would have been exposed to the PFAS as a consequence of Defendants' conduct and that such exposures were capable of causing the diseases from which Plaintiff suffers.

284. Defendants should have undertaken the research necessary to ascertain if the PFAS could adversely impact human health, whether their use, manufacture, and/or sale of the PFAS was likely to enter into the environment and whether as a consequence of the use, manufacture and/or sale of the PFAS people, such as the Plaintiff, would be injured.

285. Defendants negligently handled the PFAS and failed to prevent the injury of people such as Plaintiff who were exposed to the PFAS used, manufactured and/or sold by Defendants.

286. Defendant had a duty to take all necessary steps to prevent Plaintiff's exposure to the PFAS.

287. Defendants had the duty to undertake all studies necessary to prevent the PFAS from causing harm to Plaintiff and others.

288. Defendants had a duty to warn Plaintiff about the possible exposure to the PFAS and how to avoid that exposure.

289. Defendants breached the duty owed to Plaintiff to prevent their exposure to the PFAS.

290. Defendants breached their duty to undertake all studies necessary to prevent the

43

PFAS from causing harm to Plaintiff and others.

291. Defendants breached the duty they owed to Plaintiff to warn them about their possible exposure to the PFAS and how to avoid that exposure.

292. Defendants' conduct, with regard to the handling, release and discharge of the PFAS was unreasonable.

293. Defendants' conduct, which permitted Plaintiff's exposure to the PFAS, was unreasonable.

294. Defendants' failure to undertake all studies necessary to prevent the PFAS from causing harm to Plaintiff and others was unreasonable.

295. Defendants' failure to warn Plaintiff about her possible exposure to the PFAS and how to avoid that exposure was unreasonable.

296. Defendants are jointly and severally liable for all illnesses and injuries and derivative damages sustained by Plaintiff arising out of exposure to PFAS.

297. The acts and omissions of Defendants, including but not limited to those set forth above, were negligent.

298. Defendants' acts and omissions, including but not limited to those set forth above, proximately caused injury to Plaintiff.

299. Plaintiff has suffered and/or will in the future suffer damage, including but not limited to damage in the form of bodily injury, mental anguish, economic loss, medical expenses, loss of enjoyment of life's pleasures, and disability and they were otherwise damaged.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for compensatory and non-compensatory damages and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

## Count II
### Gross Negligence and Recklessness Misconduct
### Plaintiff v. All Defendants

300.     Plaintiff incorporates the allegations contained in all paragraphs of this Complaint as if fully restated herein.

301.     At all relevant times, Defendants committed acts and omissions with respect to PFAS with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions and/or with gross negligence

302.     Such conduct was motivated by greed in an effort to maximize profit and in disregard of their duties and responsibilities to the public and to Plaintiff.

303.     The acts and omissions of Defendants, including but not limited to those set forth above, were grossly negligent.

304.     Defendants' acts and omissions, including but not limited to those set forth above, proximately caused injury to Plaintiff.

305.     Defendants are jointly and severally liable for all illnesses and injuries sustained by Plaintiff arising out of exposure to PFAS.

306.     Plaintiff has suffered and/or will in the future suffer damage, including but not limited to damage in the form of bodily injury, emotional distress, economic loss, medical expenses and were otherwise damaged.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for compensatory and non-compensatory damages and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count III
### Absolute Liability (Abnormally Dangerous Activities)
### Plaintiff v. All Defendants

307. Plaintiff incorporates the allegations contained in all paragraphs of this Complaint as if fully restated herein.

308. At all relevant times, Defendants sold, disposed of, discharged, and/or emitted hazardous PFAS.

309. As a result of 3M's selling PFAS for use at the Chambers works and Leonard's Lane Facilities; and the remaining Defendants' discharge of the PFAS from the Chambers Works Facility into the air, soil, and the groundwater under Plaintiff's property, Plaintiff was exposed to and harmed by PFAS.

310. The manufacturing, sale, utilization, disposal, and discharge of the PFAS by Defendants constitute abnormally dangerous activities that introduce an unusual danger in the community.

311. Defendants' activities in selling, manufacturing, utilization, disposal, and discharge of the PFAS presented a high degree of risk and of harm to the person, land, and/or chattels of others.

312. It was likely that the harm resulting from Defendants' activities would be great.

313. The exercise of reasonable care does not eliminate the risk of harm posed by Defendants' activities.

314. The dangerous attributes of and risk posed by all Defendants' activities outweighed their value to the community.

315. At all relevant times, the risk of the Defendants' abnormally dangerous activities outweighed the value to the community.

316. Defendants' acts and omissions in selling, manufacturing, utilizing, disposing, and discharging hazardous chemicals proximately caused the contamination to Plaintiff's property and injuries to Plaintiff, making the Defendants absolutely liable for the harm caused by such contamination.

317. All Defendants foreseeably contributed to the contamination of the environment with the PFAS, and all subsequently contributed to Plaintiff's exposure to these chemicals, thereby causing injury to them.

318. All Defendants are jointly and severally liable for all illnesses and injuries sustained by Plaintiff arising out of exposure to the PFAS.

319. Defendants' acts and omissions, including but not limited to those set forth above, proximately caused injury to Plaintiff.

320. Plaintiff has suffered and/or will in the future suffer damage, including but not limited to damage in the form of bodily injury, mental anguish, disability, loss of enjoyment of life's pleasures, economic loss, medical expenses and was otherwise damaged.

321. As a direct and proximate result of Defendants' shipments and discharges of the PFAS, Plaintiff has and will continue to suffer damages.

47

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

**Count IV**
**Strict Liability (Failure to Warn)**
**Plaintiff v. All Defendants**

322.     Plaintiff incorporates the allegations contained in all paragraphs of this Complaint as if fully restated herein.

323.     Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied the PFAS for sale and sold such products in the ordinary course of their businesses.

324.     Upon information and belief, Defendants and John Doe Entities #1-10 and others utilized the PFAS supplied by Defendants 3M in a reasonably foreseeable and intended manner.

325.     The PFAS sold, manufactured, and used by Defendants were unreasonably dangerous to residents of surrounding communities, including Plaintiff, without adequate warnings and instructions to prevent discharge of the PFAS into the environment and accumulation inside the bodies of residents in surrounding communities, including Plaintiff.

326.     Defendants knew or should have known that the PFAS they sold would be discharged into the environment and cause contamination of the water supply of residents and accumulation in the blood serum and bodily tissues of residents living in the surrounding communities, including Plaintiff, causing her to suffer illness and disease.

327.     Defendants failed to advise Plaintiff and those foreseeably exposed to the PFAS about the risks these products posed to foreseeable third parties, such as Plaintiff, and about techniques that could be employed to reduce or eliminate these risks.

328.     Defendants had actual knowledge of the health hazards associated with the PFAS through animal studies conducted by researchers employed or contracted by such Defendants and through experience with Defendants' own workers, but, failed to share such information with purchasers, users, or those foreseeably exposed to their products.

329.     Defendants acted with reckless indifference to the health and safety of residents in communities near the facilities where the PFAS compounds were used by failing to provide adequate warnings of the known dangers of such products when discharged into the environment and ingested by nearby residents,

330.     Defendants had a duty to warn those exposed to the PFAS of the dangers of releasing the PFAS into the environment.

331.     Defendants breached the above non-delegable duties by failing to adequately warn and provide sufficient instructions to those who might be exposed to the PFAS.

332.     All Defendants are jointly and severally liable for all illnesses and injuries sustained by Plaintiff arising out of exposure to the PFAS.

333.     Plaintiff has suffered and/or will in the future suffer damage, including but not limited to damage in the form of bodily injury, mental anguish, disability, loss of enjoyment of life's pleasures, economic loss, medical expenses and was otherwise damaged.

49

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

**Count V**
**Private Nuisance**
**Plaintiff v. All Defendants**

334.    Plaintiff incorporates the allegations contained in all preceding paragraphs as if fully restated herein.

335.    Defendants' acts and omissions with respect to the release of the PFAS in the environment resulted in the contamination of the air, soil, and water, including but not limited to Plaintiff's water supply, and have thus unreasonably interfered with Plaintiff's use and enjoyment of their property, invading the home and body of Plaintiff.

336.    Defendants acts and omissions with respect to the release of the PFAS has made Plaintiff's water supply unfit for consumption and other domestic purposes.

337.    Defendants' unreasonable interference with the use and enjoyment of Plaintiff's property constitutes a continuous invasion of her rights.

338.    Defendants all contributed to the contamination of the environment with PFAS and all substantially contributed to a private nuisance on Plaintiff.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for compensatory and non-compensatory damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

**Count VI**
**Public Nuisance**

50

**Plaintiff v. All Defendants**

339.     Plaintiff incorporates the allegations contained in all preceding paragraphs as if fully restated herein.

340.     Defendants' conduct detailed above unreasonably interfered with a right common to the general public, including the public's right to be free from environmental contamination in the air it breathes and water it drinks, and in which its members bathe, shower, and swim.

341.     Defendants' conduct detailed above unreasonably and significantly interfered with the public health and public safety by contaminating water, soil, and air with toxic and carcinogenic chemicals.

342.     Defendants' conduct was of a continuing nature, and/or produced a long-lasting effect, and Defendants knew and/or had reason to know that it would have a significant effect on the public's rights.

343.     Plaintiff suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public.

344.     Defendants' acts and omissions with respect to the release of the PFAS in the environment including the air, soil, and water resulted in the contamination of Plaintiff's homes and private water supplies.

345.     Defendants' unreasonable interference with the use and enjoyment of Plaintiff's property constitutes a continuous invasion of her rights.

346.     Defendants all contributed to the contamination of the environment with the PFAS, and all subsequently contributed to the public nuisance imposed on Plaintiff.

347.     Defendants' creation of a continuing public and/or private nuisance has damaged

Plaintiff in the form of bodily injury, emotional distress, and other damages all of a type not common to the general public, for which Defendants are liable.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

**Count VII**
**Past and Continuing Trespass**
**Plaintiff v. All Defendants**

348.    Plaintiff incorporates the allegations contained in all preceding paragraphs as if fully restated herein.

349.    As related above, Plaintiff was an owner and/or possessor of real property and resides or resided on those properties.

350.    Defendants negligently, recklessly, and/or intentionally failed to properly control, apply, use and/or dispose of the PFAS resulting in its discharge into the environment entering, invading, intruding, and injuring the rights of Plaintiff to possess and enjoy her properties.

351.    Plaintiff has not consented and does not consent to the contamination alleged herein, and Defendants knew or reasonably should have known that Plaintiff would not consent to such.

352.    Defendants all contributed to the contamination of the environment with the PFAS, and all subsequently contributed to the past and continuing trespass imposed on Plaintiff.

353.    As a direct and proximate result of Defendants' acts and omissions as alleged

herein, the soil and drinking water wells on Plaintiff's properties have been contaminated with PFAS, causing significant personal injuries and damage, including actual, consequential, and nominal damages as described above.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

## Count VIII

### Strict Liability (Defective Design)
### Plaintiff v. All Defendants

354. Plaintiff incorporates the allegations contained in all preceding paragraphs as if fully restated herein.

355. Defendants designed, manufactured, and sold the PFAS that were used at the Chambers works and Leonard Lane facilities and elsewhere as discussed above.

356. As a manufacturer and seller of the PFAS, Defendants had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses.

357. Defendants owed that duty to direct users of their products, to reasonably foreseeable users of its products, and also to any person who might reasonably be expected to come into contact with these products, such as Plaintiff.

358. Defendants and owed that duty to direct users of their products, to reasonably foreseeable users of their products, and also to any person who might reasonably be expected to come into contact with these products, such as Plaintiff.

359. Defendants' products were used in a reasonably foreseeable manner and without

substantial change in the condition of such products and were defective and unfit for their reasonable use.

360.     Defendants knew or should have known that use of their products would result in the spillage, discharge, and/or release the PFAS into the environment and would contaminate the environment including the groundwater, air, soil, and drinking water of surrounding communities, including Plaintiff.

361.     Defendants knew or should have known that its products including the PFAS would eventually come into contact with and harm residents in surrounding communities, including Plaintiff.

362.     Defendants' products were defective in design and unreasonably dangerous because, among other things: a) the PFAS cause extensive and persistent contamination when used in a reasonably foreseeable and intended manner; and b) the PFAS cause contamination in the environment, including the air, soil, and groundwater, which are the sources of drinking water to citizens in the surrounding communities, including Plaintiff, and pose significant threats to her health, safety, and welfare.

363.     At all relevant times, Defendants' products which they designed, manufactured, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

364.     The foreseeable risk to public health and welfare, including that of Plaintiff, posed by Defendants' products outweighed the cost to Defendants of reducing or eliminating such risk.

365.     Defendants knew or should have known about reasonably safer and feasible alternatives to their products that contained the PFAS.

54

366.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has and will continue to suffer damages.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees and all such other relief as the Court deems proper.


## JURY DEMAND

Plaintiff(s) hereby demand a trial by jury on all issues so triable.


## DESIGNATION OF TRIAL COUNSEL

Steven Phillips, Esq. is hereby designated as trial counsel on behalf of Plaintiff.


## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

The undersigned counsel certify that, with the following exceptions, the matter in controversy is not the subject of any other action pending or contemplated:

1.  John Giordano et al. v. Solvay Specialty Polymers, USA, et al., C.A., No. 1:19-cv-21573, which is venued in the Camden Vicinage; and

2.  Kimberly Bond et al. v. Solvay Specialty Polymers USA, LLC, et al. C.A., No.1:20- cv-08487, which is venued in the Camden Vicinage.

3.  Theresa Slusser, et al. v. Solvay Specialty Polymers, et al. – Docket No. 1:20-cv- 11393

4.  Corby Deese and Tammy O'Leary v. Solvay Specialty Polymers, et al. – Docket No. 1:21-cv-217

5.  Carly Corrar and Shirley Bond v. Solvay Specialty Polymers, et al. – Docket No. 1:21-cv-452

6. Shirley Bond v. Solvay Specialty Polymers, et al. – Docket No. 1:21-cv-11203

7. Nicole Bond v. Solvay Specialty Polymers, et al. – Docket No. 1:21-cv-20755

8. Marcia M. Philipp, Gerald L. Philipp, h/w and Gerald E. Philipp v. Solvay Specialty Polymers, et al. – Docket No. 1:22-cv-395

9. Erin Allbritton v. v. Solvay Specialty Polymers, et al. – Docket No. 1:22-cv-397

10. Stacy Allen v. v. Solvay Specialty Polymers, et al. – Docket No. 1:22-cv-396

11. Renee Mesogianes and William Mesogianes v. v. Solvay Specialty Polymers, et al. –Docket No. 1:22-cv-394

12. Lombardo, et al. v. Solvay Specialty Polymers, USA, LLC, et al. – Civil No. 20- 15014

13. Lloyd v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 21-9705

14. Briggs, et al. v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 21-9699

15. Britton, et al. v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 21-9707

16. Gouse, et al. v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 21-9711

17. Philipp, et al. v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 21-9714

18. Callis, et al. v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 21-1521

19. Severa, et al. v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 20-6906

20. Borough of National Park v. Solvay Specialty Polymers, USA, LLC, et al. – Civil No. 21-9725 (NLH/AMD)

21. Walzer et al. v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 23-4174

22. Counselor v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 24-10189

23. Dupper et al. v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 24-10533

24. Blymer et al v. Solvay Specialty Polymers USA, LLC et al Civil No 25-13774

25. Strohm et al. v. Solvay Specialty Polymers USA, LLC et al., BUR-L-000508-26 (N.J. Sup. Ct. - Burlington County);

26. Harrel et al. v. Solvay Specialty Polymers USA, LLC et al., CAM-L-000245-26 (N.J. Sup. Ct. - Camden County); and

27. Rebel et al. v. Solvay Specialty Polymers USA, LLC et al., BUR-L-000911-26 (N.J. Sup. Ct. - Burlington County).

28. Johnson et al. v. E.I. Du Pont de Nemours & Company et al., 1:26-cv-02260-ESK-AMD

29. Mitchell et al. v. E.I. Du Pont de Nemours & Company et al., 1:26-cv-00708-ESK-AMD

The undersigned counsel further certify that we are aware of no other parties who should be joined in this matter at this time.

**PHILLIPS & PAOLICELLI, LLP**
Attorneys for Plaintiff

BY:     s/  Steven Phillips
_____
Steven Phillips, Esq. NJ Bar ID 007601984

**COONEY & CONWAY**
Attorneys for Plaintiff

57

BY:    s/  Kevin Conway

Kevin Conway, Esq.


**WATERS KRAUS PAUL & SIEGEL**
Attorneys for Plaintiff


BY:    s/  Peter A. Kraus

Peter A. Kraus, Esq.


Dated:  August 7, 2026